Michael A. Hanley, individually, and derivatively on behalf of himself and all others similarly situated, Plaintiff,

against
Albert V. Hanley III, ANDREA K. HANLEY, THE COMMERCIAL DRIVER'S LICENSE SCHOOL, INC. and CDL RESEARCH & DEVELOPMENT GROUP, LLC, Defendants, and THE COMMERCIAL DRIVER'S LICENSE SCHOOL, INC. and CDL RESEARCH & DEVELOPMENT GROUP, LLC, Nominal Defendants.
In the Matter of the Application of MICHAEL A. HANLEY, Petitioner, For Judicial Dissolution of THE COMMERCIAL DRIVER'S LICENSE SCHOOL, INC., pursuant to Articles 11 and 12 of the New York Business Corporation Law and/or the common law, and CDL RESEARCH & DEVELOPMENT GROUP, LLC, Pursuant to Fla. Stat. § 605.0702 and/or the common law.

901348-19 

Harris Beach PLLC
Attorneys for Plaintiff/Petitioner
(Dale Worrall, Elliot A. Hallak and Kirstie A. Means, of counsel)
677 Broadway, Suite 1101
Albany, New York 12207
Whiteman Osterman & Hanna, LLP
Attorneys for Albert V. Hanley III and Andrea K. Hanley
(William S. Nolan and James J. Wisniewski, of counsel)
One Commerce Plaza
Albany, New York 12260
E. Stewart Jones Hacker Murphy, LLP
Attorneys for The Commercial Driver's License School, Inc. and CDL Research & Development Group, LLC
(Thomas J. Higgs, of counsel)
28 Second Street
Troy, New York 12180
Saul Ewing Arnstein & Lehr, LLP
Co-counsel to The Commercial Driver's License School, Inc. and CDL Research & Development Group, LLC
(Phillip Hudson, III, Esq., of counsel) (admitted pro hac vice)
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 3600
Miami, Florida 33131


Richard M. Platkin, J.

In this hybrid action/proceeding, plaintiff/petitioner Michael A. Hanley moves by Order to Show Cause dated March 7, 2019 for an order: (1) dissolving The Commercial Driver's License School, Inc. ("CDL School") pursuant to Business Corporation Law § 1104-a and/or the common law; (2) dissolving CDL Research & Development Group, LLC ("CDL Research") pursuant to Fla. Stat. § 605.0702 and/or the common law; (3) appointing a receiver for CDL [*2]School and CDL Research (collectively, "the Corporations"); and (4) enjoining defendants Albert V. Hanley III and Andrea K. Hanley, who are plaintiff/petitioner's siblings, from exercising certain powers of the Corporations.
Defendants Albert V. Hanley III and Andrea K. Hanley ("defendants") oppose the application for injunctive relief and cross-move pursuant to CPLR 3211 (a) (1), (2) and (7) for dismissal of the Verified Complaint/Petition (see NYSCEF Doc No. 3 ["Complaint"]). The Corporations also oppose the application and separately cross-move for dismissal of the Complaint on the basis of the same arguments advanced by defendants.
Oral argument on the motions was held on May 16, 2019, and this Decision & Order follows.
BACKGROUND
A. The Companies and the Parties
According to the Complaint, CDL School was co-founded in 1991 by plaintiff/petitioner Michael Hanley ("plaintiff" or "Michael"), defendant Albert V. Hanley III ("Albert") and their father. Initially, the father owned 51% of CDL School, and Albert and Michael each owned a 24.5% interest in the corporation.
As set forth in its Certificate of Incorporation, CDL School was formed to: (1) establish a school for training commercial drivers; (2) prepare and sell materials used to educate and train commercial drivers; (3) acquire real property needed for the foregoing activities; and (4) engage in any lawful act or activity for which a corporation may be formed under the Business Corporation Law ("BCL") (see NYSCEF Doc No. 4). CDL School historically has offered programs and services directed at training and educating commercial truck drivers.
By 2001, the father's role in CDL School had declined, and there was dissension among the original owners. As a result, Michael sold his shares in CDL School to Albert for $5,000.
In or about 2010, Michael, Albert and their sister, Andrea Hanley ("Andrea"; collectively "the Siblings"), formed CDL Research as a Florida limited liability company. According to plaintiff, CDL Research was intended to serve as a safety net in the event that the continuing viability of CDL School was imperiled by ongoing shareholder dissension. Plaintiff alleges that the overall operation and purpose of the Corporations are virtually indistinguishable.
In 2015, Michael repurchased shares in CDL School from his mother following his parents' divorce. At the present time, Albert holds 50% of CDL School's shares, and Michael and Andrea each hold a 25% ownership interest.
In 2013, CDL School implemented a program in conjunction with the United States Army, "Troops into Transportation," that offered driving training to service members on a large military base. The program was very successful and soon was expanded to other installations.
B. The Asset Sale to TransForce
In or about February 2018, CDL School and TransForce, Inc. ("TransForce") reached an agreement in principle whereby CDL School would sell all of its assets to TransForce in exchange for: (i) an initial base purchase price of about $25 million, paid at the time of closing; (ii) an equity stake in TransForce; and (iii) two "earn out" payments to be made in 2019 and 2020 based upon the company's performance in the preceding year. According to Michael, the aggregate proceeds from the asset sale ("Sale Proceeds") were at least $80 million.
The asset sale closed on December 16, 2018, with TransForce wiring about $24 million to [*3]CDL School and $1.25 million to CDL Research. As part of the transaction, the Siblings agreed to continue their day-to-day roles and responsibilities as employees of a TransForce subsidiary, CDL School, LLC. In consideration for their continued involvement and the execution of non-competition agreements in favor of TransForce, the Siblings were granted a total of $500,000 in annual compensation to divide among themselves.
C. Plaintiff's Contentions
Plaintiff alleges that CDL School's activities should be limited to collecting the Sale Proceeds and distributing them to the three shareholders. Plaintiff reasons that, following the asset sale, the Corporations no longer are engaged in training and educating commercial drivers, and the Siblings are employed by, and prohibited from competing against, TransForce.
Instead, plaintiff complains, Albert and Andrea are using their majority interest in, and control over, CDL School to engage in a pattern of hostile and oppressive conduct towards him. In his Complaint, plaintiff identifies at least five types of improper conduct:
First, plaintiff cites defendants' "improper[] and ineffective[] [attempts to] remove [him] from the Board of Directors" of CDL School (Complaint, ¶ 42). "More specifically, through a shifty sequence of calling various 'Special Meetings,' Albert and Andrea have attempted to remove Michael from the Board and gain full control of [CDL School] and the Sale Proceeds" (id.). Plaintiff argues that such efforts by defendants "to leverage their combined majority control to improperly gain control of the Board and the Sale Proceeds" should be deemed a nullity (id., ¶ 43).
Second, plaintiff cites defendants' threats "to impose exorbitant 'fines' upon [him]" in connection with his TransForce employment (id., ¶¶ 38, 44 & Ex. C). Plaintiff also complains that defendants receive an annual salary of $200,000 at TransForce, whereas he receives a salary of only $78,000 (see Complaint, ¶¶ 34-36).
Third, plaintiff alleges that defendants have attempted to force him to sell his CDL School shares for an unreasonably low price. In this regard, the Complaint alleges that within a few days of the closing of the asset sale to TransForce, defendants "confronted Michael with an ultimatum in the form of a three-page PowerPoint . . . present[ing] two options: a Solution Plan and a Severance Package, suggesting that Michael needs to accept one in order to be entitled to a distribution of the Sale Proceeds" (id., ¶ 46; see id., Ex. D ["PowerPoint"]).
Under the Solution Plan, Michael would continue to work at TransForce on a probationary basis for six months and be required to: receive coaching on communication skills; commit to making company responsibilities a priority; and provide his Siblings with regular updates on work activities (see PowerPoint, p. 1). The Solution Plan also contemplated amendments to the shareholder/member agreements of the Corporations "to ensure an easy/simple defined forced redemption" if plaintiff failed to adhere to the foregoing conditions. In exchange, the Corporations would agree to "distribute up to 85% of proceeds of close and 2018 earn out" (id.).
Alternatively, the Severance Package would pay Michael the sum of $11.25 million, which would consist of 25% of the closing proceeds ($6.25 million), 25% of the projected 2018 earn out of $16 million ($4 million) and an additional $1 million in cash (see id., p. 3). In addition, Michael would assist in a transition for six months and be paid $8,300 per month for such services (id.).
Plaintiff rejected both options, and Albert then called a special meeting of the CDL School shareholders that was held on January 10, 2019. The agenda consisted of two items: (1) election of a new board of directors; and (2) "discussion and review of investment options of the [Sale P]roceeds" (Complaint, Ex. E). At this meeting, defendants allegedly "pressure[d]" Michael to agree to either the Solution Plan or the Severance Package (Complaint, ¶¶ 52-53 & Ex. F).
On February 28, 2019, Albert noticed a "Special Meeting" of the CDL School shareholders to be held on March 11, 2019 for the purpose of addressing two items: (1) the redemption of Michael's shares; and (2) "[d]iscussion of investment or distribution" of the Sale Proceeds (Complaint, Ex. G).
In connection with the contemplated redemption of shares, Albert advised Michael on or about January 24, 2019 that he had retained Albert Corrada to prepare a valuation of CDL School (see Complaint, ¶ 57). According to plaintiff, Corrada operates a sole accounting practice and "previously performed some limited accounting work for the CDL School" (id., ¶ 58). Plaintiff contends that CDL School "engaged a different and larger accounting firm to assist with the sale to TransForce, and to assist with [the Corporations'] 2018 tax returns" (id., ¶ 59), and it is "unknown" what role Corrada played in the TransForce sale, what experience he has in performing similar valuation work, and what information or documentation he relied upon in performing the valuation (id., ¶¶ 60-62).
On February 20, 2019, Albert shared with Michael a report prepared by Corrada (see id., ¶ 63 & Ex. H ["Valuation Report"]). The report states that Corrada performed a "calculation engagement," which means that the accountant and client agreed in advance on the approaches, methods and extent of procedures to be used to value CDL School "solely to assist in the matter of a preliminary internal management valuation" (Valuation Report, p. 1). Based on calculations made pursuant to these agreed-upon procedures, the "calculated value" of CDL School as of December 31, 2018 was between $40 and $41 million (id.).
According to plaintiff, the Valuation Report "grossly undervalues" CDL School, inasmuch as the calculated value is "approximately half of the amount (nearly $40 million less) . . . previously forecasted by Albert" (Complaint, ¶ 64). Moreover, defendants "have failed to disclose the information and assumptions relied upon by" by the accountant (id., n 7). Thus, plaintiff claims that defendants are attempting to force a redemption of his shares for "less than fair value" (id., ¶ 65).
Fourth, plaintiff alleges that defendants have threatened to use the Sale Proceeds "to pay themselves exorbitant, unjustifiable bonuses to Michael's exclusion" (id., ¶ 66). In particular, plaintiff submits a February 12, 2019 email in which Albert states that "[i]t is appropriate for the officers of the company (Andrea and [m]yself) to be awarded bonuses for closing the sale [with TransForce] and the post-sale integration" (id., Ex. I). In the same email, Albert confirms that "[i]t is satisfactory and normal for the company to make loans to [its] officers if approved by the board" (id.). According to plaintiff, "the sole purpose and effect of these loans and bonuses can only be to loot corporate assets and deprive Michael [of] his fair share of the Sale Proceeds" (Complaint, ¶ 67).
Finally, plaintiff alleges that, "in a concerted effort to force Michael to accept less than the fair value of his shares in the Sale Proceeds, Albert and Andrea have threatened to [*4]indefinitely tie up Michael's share[s] by . . . us[ing] the Sale Proceeds for completely unrelated business ventures" (id., ¶ 68). While unaware of the particulars, plaintiff alleges, upon information and belief, that defendants "intend to invest in distressed real estate, a purpose wholly distinct from that which is set forth in the Certificate of Incorporation, and entirely removed from the historical business of the CDL School" (id.). 
On the basis of the foregoing, plaintiff alleges nine causes of action: (1) dissolution of CDL School pursuant to BCL § 1104-a; (2) dissolution of CDL School under the common law; (3) an accounting of CDL School; (4) a derivative claim on behalf of CDL School alleging that defendants breached their fiduciary duties owed to the corporation; (5) dissolution of CDL Research pursuant to Fla. Stat. § 605.0702 and/or the common law; (6) an accounting of CDL Research; (7) a derivative claim on behalf of CDL Research for breach of fiduciary duties owed to the company; (8) a declaration determining Michael's "current ownership interests and rights in the CDL School, [CDL Research] and the Sale Proceeds"; and (9) injunctive relief, including the appointment of a receiver for the Corporations.
Plaintiff commenced this action via an Order to Show Cause ("OTSC") dated March 7, 2019. The OTSC includes a temporary restraining order ("TRO") enjoining defendants from taking actions of the type complained of by plaintiff.
D. Defendants' Opposition and Cross Motion
Defendants argue that plaintiff's claim of shareholder oppression under BCL § 1104-a is without merit, emphasizing their willingness to purchase plaintiff's shares pursuant to the Severance Package, as well as the availability of forced redemption for fair market value pursuant to the CDL School shareholders' agreement. Defendants further contend that: plaintiff has failed to state a claim for the common-law dissolution of CDL School; this Court lacks jurisdiction to dissolve CDL Research, a Florida limited liability company; and the remaining claims alleged by plaintiff must be dismissed pursuant to the forum selection clauses contained in CDL School's shareholders' agreement and in CDL Research's operating agreement.
1. Affidavit of Albert V. Hanley III
a. CDL School
According to Albert, neither Michael nor Andrea were involved in founding CDL School (NYSCEF Doc No. 31 ["Albert Aff."], ¶ 4). Rather, Michael joined the company as an employee in 1993, two years after the corporation had been founded by Albert and their father, and Michael was gifted 24.5% of CDL School in September 1994 (see id., ¶ 6). Michael sold his shares to Albert in 2001 (see id., ¶ 8), but Michael repurchased a 25% ownership interest in January 2015 for $150,000 (see id., ¶ 11). In connection with the changes in ownership of CDL School, the Siblings executed a shareholders' agreement for the corporation dated January 1, 2015 (see id., ¶ 13 & Ex. C ["Shareholders' Agreement" or "Agreement"]).
b. The CDL School Shareholders' Agreement
Section 1.4 of the Shareholders' Agreement provides that a majority of shareholders may "vote to require another Shareholder (the 'Redeeming Shareholder') to Transfer to the Company . . . all or any portion of the Shares of such Redeeming Shareholder." Under this provision, "the purchase price for the Shares . . . shall be equal to the [f]air market value of such Shares, as determined by the certified public accountant then servicing the books of the Company" (id.).
Also relevant to the pending applications is Section 6.3, which provides that the [*5]Shareholders' Agreement "shall be governed by, construed and enforced in accordance with the internal laws of the State of Florida, and venue for any dispute under the Agreement resulting in litigation shall be in Miami-Dade County, Florida."
c. CDL Research's Operating Agreement
Albert submits an Operating Agreement signed by the four members of CDL Research: Albert (31%), Andrea (25%), Michael (25%) and CDL School (19%) (see Albert Aff., Ex. D ["Operating Agreement"]; see also Albert Aff., ¶ 19). Albert is the manager of CDL Research (see Operating Agreement, § 3.1), which gives him "sole and exclusive control over the Company" (id., § 6.1). Pursuant to Section 15.11, the Operating Agreement of CDL Research "shall be governed by, and construed in accordance with the laws of the State of Florida and venue for the exclusive enforcement hereof shall be Miami-Dade County, Florida."
d. The Asset Sale to TransForce
By March 2018, the Corporations had executed an asset-purchase agreement with TransForce, and a substantial amount of work remained in order to close the transaction (see Albert Aff., ¶ 27). According to Albert, "[a]s the closing . . . approached, Michael attended fewer meetings and only sporadically attended our mandatory Thursday check-in calls . . . with Trans[F]orce" (id.). The Corporations also needed to obtain regulatory approvals in the states where they operated, but Michael is said to have accepted only two of 20 assignments, and he "failed to complete [even] this work" (id., ¶ 28). In Albert's words, "Michael essentially went into early retirement" (id.).
Defendants then attempted to initiate discussions with Michael as to his preferred role going forward, but Michael failed to provide a direct response (see id., ¶ 29). Several days prior to the closing, Michael refused to sign an employment and non-competition agreement, which was a condition of the closing (see id., ¶ 30). Nonetheless, TransForce proceeded to close, despite Michael's failure to execute the required agreement (see id.).
The closing was held on December 16, 2018 (see id., ¶ 31). According to Albert, "[c]ontrary to Michael's allegation, the total value of this transaction is not expected to reach $80 million. The value of the transaction is only expected to reach a maximum of $50.5 million" (id.). The $50.5 million figure includes $25 million in cash received at the closing, a $13 million earn out for 2018, and a maximum expected earn out of $2.5 million for 2019. The remaining component of the Sale Proceeds is "non-saleable stock in Trans[F]orce that has an agreed upon value of $10 million, but has no current cash value" (id., ¶ 32).
Based on Michael's allegedly continued unwillingness to state whether he wanted to remain involved in the business, defendants informed Michael that "if he did not provide any clarification . . . before March 1, 2019, we would be forced to exercise our rights to elect to redeem Michael's shares under the Shareholders' Agreement at fair market value" (id., ¶ 35). Defendants "had the CDL School's certified public accountant prepare a valuation report . . . for purposes of exercising [this] right of election" (id.).
Finally, at paragraph 39 of his affidavit, Albert avers that defendants do not wish to dissolve the Corporations, explaining:
We have a 27 year history of strong credit, operational expertise, and commercial relationships, all of which are a major advantage when starting new ventures. We intend to use these resources to move the companies in a different direction, and are researching [*6]the possibility of investing our capital gains from the sale into qualified opportunity zones. An investor who has a capital gain in 2018 can defer the taxes that are due and invest into qualified funds that own, buy, improve, and manage real estate. These taxes are deferred for seven years and reduced 15%, and at the end of the hold period gains are returned and not taxable. These funds typically return 2.5 times to 3 times the investment, potentially a $10 million net return to us. While Michael opposes this opportunity, referring to it as 'distressed real estate,' he has another alternative available to him that will allow him to recover a monstrous return on his $150,000 investment in the CDL School — the buy-out provision in the Shareholders' Agreement that Andrea and I have elected to follow. The only thing blocking that opportunity is this lawsuit.
2. Affidavit of Andrea K. Hanley
Andrea states that from 2007 through 2010, CDL School "had trouble fitting Mike into any role where he was productive" (NYSCEF Doc No. 38 ["Andrea Aff."], ¶ 7). She partly attributes these difficulties to their father "transitioning out of the business" (id.), which led the Siblings to establish CDL Research "to generate new business and side projects" (id., ¶ 8).
Andrea's affidavit also supplies the Siblings' base salaries for 2015 through 2017, which were modest and generally consistent with one another (see id., ¶ 10). The Siblings also received substantial bonuses and distributions from the Corporations (see id., ¶ 11). For example, Michael earned about $800,000 in 2016 on a base salary of $78,000 (see id., ¶ 12).After serious discussions commenced in 2017 about the possible merger or acquisition of the Corporations, Andrea and Albert "began to develop significant staff issues in Michael's area of influence — training operations" (id., ¶ 13). "Around this time, Michael became more and more unavailable for meetings and discussions about the future growth of [the Corporations] and the potential roles that he wanted to play in the companies' growth" (id., ¶ 14). Despite these issues, Michael received about $1.4 million in total compensation in 2017 (see id., ¶ 16).
According to Andrea, "Michael's work ethic continued to deteriorate in 2018," citing an issue at Fort Hood that caused CDL School to lose that location (id., ¶ 17). Due to Michael's alleged lack of communication, Albert requested that he provide weekly updates on the projects that he was managing (see id., ¶ 18).
In June 2018, following a meeting with potential buyers of the Corporations, Michael "pledged his commitment and dedication to the companies and promised that he would change his problematic behaviors" (id., ¶ 19). Despite this pledge, Michael "fail[ed] to identify the role he wished to play [in] the new company" (id., ¶ 23). Andrea also cites a "tough discussion" with Michael in which she "encouraged him to find work that he was more passionate about and would be more involved in. I could see from his actions in all his time with the company that he did not take it seriously and was not professional" (id., ¶ 25).
Finally, Andrea denies ever oppressing Michael. "To the contrary we have worked with him for over 20 years in spite of his consistent problems. He has always received the compensation that I have in material part except I received bonuses he did not because he did not earn bonuses in some cases. In fact, he often put the company in jeopardy" (id., ¶ 26).
3. Defendants' Principal Arguments and Contentions
In opposing the OTSC and moving separately for the dismissal of the Complaint pursuant [*7]to CPLR 3211 (a) (1), (2) and (7), defendants argue that Michael's claim of oppression under BCL § 1104-a is disingenuous in light of their offer to buy-back his shares for $11.25 million — a 7,400% return on his original investment of $150,000, and a purchase price that is said to be greater than what Michael would receive in a forced redemption under Section 1.4 of the Shareholders' Agreement. Defendants further contend that the availability of a fair market value buy-out remedy under Section 1.4 precludes the relief sought by plaintiff and that plaintiff has failed to demonstrate a basis for the interim relief he seeks. Finally, defendants argue that this Court lacks jurisdiction to dissolve CDL Research, and the forum selection clauses in the Shareholders' Agreement and Operating Agreement prohibit Michael from litigating his remaining claims in this Court.
E. Plaintiff's Reply and Opposition
1. Plaintiff's Reply Affidavit
Plaintiff asserts in reply that defendants "do not, and cannot, dispute using their majority control over the Corporation to engage in a pattern of oppressive conduct toward [him] and [his] interests as a minority shareholder" (NYSCEF Doc No. 61 ["Michael Reply Aff."], ¶ 2). In particular, plaintiff cites: defendants' "intention to impose exorbitant fines against [him] for arbitrary and improper reasons"; their "intention to award themselves (but not [him]) exorbitant $6 million loans" and "exorbitant $4 million bonuses"; their "intention to modify Corporation agreements to protect the majority shareholders only"; their intention to "force [plaintiff] to accept their 'severance package' (which they now relabel a 'redemption of shares') based upon a wholly inadequate valuation at a steep reduction of what [he] believe[s] represents the fair value of [his] interest in the Corporation"'; and their "intention, over [plaintiff's] objection, to invest a portion of the Sale Proceeds into distressed real estate" (id.).
As to the contemplated redemption, Michael avers that Corrada "is not the accountant currently servicing the CDL School. That role is now handled by Marcum LLP" (id., ¶ 11; see also id., Ex. B [email from Albert stating that he is "waiting on Marcum for final Tax numbers"]). Plaintiff further avers that Corrada, a sole practitioner, "is closely aligned with Albert," who "has stated to [plaintiff] on multiple occasions that Mr. Corrada will do anything Albert tells him to do" (Michael Reply Aff., ¶ 12). Plaintiff also observes that Corrada's valuation "lack[s] any reasonable detail and fails to indicate what information or documentation may have been provided" to the accountant or relied upon by him (id., ¶ 13). 
Plaintiff further complains that the Severance Package would deny him any interest in the 2019 earn out and the TransForce stock (see id., ¶ 15). In addition, plaintiff rejects the $50.5 million valuation of the Sale Proceeds cited by Albert (see id., ¶ 17).
Finally, while plaintiff does not deny the authenticity of the Shareholders' Agreement and Operating Agreement submitted by defendants, plaintiff argues that he is not "claiming a breach of or dispute arising under either document" (id., ¶ 24).
2. Legal Arguments
Plaintiff argues that he has established a prima facie case of oppression under BCL § 1104-a that defendants have failed to refute, and the Severance Package does not bar his claims for dissolution or interim relief. Thus, plaintiff contends that a temporary receiver should be appointed.
Plaintiff further argues that the Severance Package proposal was not made pursuant to the [*8]redemption provisions of Section 1.4 and, in any event, the Shareholders' Agreement most likely terminated upon the close of the asset sale to TransForce. 
Finally, plaintiff argues that Albany County is a proper venue for the dissolution of CDL School, and the interests of economy counsel in favor of this Court adjudicating matters pertaining to CDL Research, given the close relationship between the two Corporations.
CROSS MOTION TO DISMISS
The Court begins with defendants' cross motion to dismiss the Complaint pursuant to CPLR 3211 (a) (1), (2) and (7).
A. Legal Standard
"Under CPLR 3211 (a) (1), dismissal is warranted if documentary evidence conclusively establishes a defense as a matter of law" (Haire v Bonelli, 57 AD3d 1354, 1356 [3d Dept 2008], [citations omitted]). On such a motion, "affidavits submitted by a defendant do not constitute documentary evidence upon which a proponent of dismissal can rely" (Crepin v Fogarty, 59 AD3d 837, 838 [3d Dept 2009]).
In considering a motion to dismiss pursuant to CPLR 3211 (a) (7), "the Court must afford the pleadings a liberal construction, take the allegations of the complaint as true and provide plaintiff the benefit of every possible inference" (EBC 1, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]). The Court's "sole criterion is whether the pleading states a cause of action" (Polonetsky v Better Homes Depot, 97 NY2d 46, 54 [2001] [internal quotation marks and citation omitted]). As with a motion under CPLR 3211 (a) (1), the Court must "ignore the affidavits submitted by defendants" (Henbest & Morrisey v W.H. Ins. Agency, 259 AD2d 829, 830 [3d Dept 1990]).
Finally, a cause of action must be dismissed under CPLR 3211 (a) (2) where it is shown that the Court lacks subject matter jurisdiction.
A. BCL § 1104-a Claim (CDL School)
1. Legal Standard
A holder of 20% or more of the shares of a business corporation may obtain dissolution if "[t]he directors or those in control of the corporation have been guilty of . . . oppressive actions toward the complaining shareholder[]" (BCL § 1104-a [a] [1]). Dissolution also is warranted if "[t]he property or assets of the corporation are being looted, wasted or diverted" (id., [a] [2]).
The term "oppressive actions" used in BCL § 1104-a (a) (1) refers to conduct that substantially defeats the reasonable expectations of the minority shareholder:
Given the nature of close corporations and the remedial purpose of the statute, this court holds that utilizing a complaining shareholder's 'reasonable expectations' as a means of identifying and measuring conduct alleged to be oppressive is appropriate. A court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression. Rather, oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under [*9]the circumstances and were central to the petitioner's decision to join the venture (Matter of Kemp & Beatley [Gardstein], 64 NY2d 63, 73 [1984]).
A finding of oppression "may be based on the complaining shareholder's frustrated expectations in such matters as . . . a share in the profits . . . of the corporation, such that [he or] she feels that the other shareholders have deprived [him or] her of a reasonable return on [his or] her investment" (Matter of Parveen, 259 AD2d 389, 391 [1st Dept 1999]; see Matter of Williamson v Williamson, Picket, Gross, 259 AD2d 362, 362 [1st Dept 1999]). Oppression also may be found where the minority shareholder is excluded from the management or operations of the closely-held corporation (see Matter of Clever Innovations, Inc. [Dooley], 94 AD3d 1174, 1176 [3d Dept 2012]).
Even where there has been a showing of oppression or looting, however, a court "determining whether to proceed with involuntary dissolution" must consider "[w]hether liquidation of the corporation is the only feasible means whereby the petitioner[] may reasonably expect to obtain a fair return on [his or her] investment" (BCL § 1104-a [b]).
2. Availability of the Severance Package
Defendants argue that plaintiff's claim of minority oppression is disingenuous in light of their offer to purchase his minority interest in CDL School for $11.25 million, a 7,400% return on plaintiff's original investment and more than what he would receive under a Section 1.4 redemption (see Matter of Apple [Apple Rubber Prods.], 224 AD2d 1016, 1017 [4th Dept 1996] [mandatory buy-out provision in shareholders' agreement defeats any "reasonable expectation" that petitioner "would be employed and would be a shareholder for life"], lv denied 88 NY2d 811 [1996]). Thus, defendants argue that plaintiff cannot demonstrate that his reasonable expectations as an owner of CDL School were substantially defeated by the oppressive conduct alleged in the Complaint.
As an initial matter, the Court concludes that the reasonableness of the $11.25 million offered under the Severance Package remains open to question. As observed by plaintiff, the Severance Package does not accord him any portion of the 2019 earn out, which Albert acknowledges could be as much as $2.5 million (see Albert Aff., ¶ 32). Nor would plaintiff receive compensation for the TransForce stock held by CDL School, which, according to Albert, "has an agreed upon value of $10 million, but has no current cash value" (id.). 
Thus, to the extent that plaintiff's claim of oppression may be conclusively defeated by defendants' willingness to purchase his minority interest in CDL School pursuant to the Severance Package, there has been no conclusive demonstration that defendants' $11.25 million offer is reasonably reflective of the fair value of plaintiff's 25% ownership interest. And, contrary to defendants' contention, there is no persuasive basis to conclude that plaintiff's reasonable expectations concerning his ownership interest in CDL School are derived from an expected percentage return on his original investment.
Moreover, even if defendants had established the reasonableness of the Severance Package, plaintiff alleges, in essence, that defendants are using, or threatening to use, oppressive [*10]means to force him to accept a buy-out.[FN1]
In this regard, plaintiff cites defendants' alleged threats to indefinitely tie up the Sale Proceeds in long-term investments unrelated to CDL School's historic mission of driver training while defendants grant themselves multi-million dollar bonuses and loans from the Sale Proceeds. Defendants cite no authority allowing majority shareholders to use oppressive means to force a voluntary buy-out, even a reasonable one.
Nor have defendants established that the $11.25 million offered under the Severance Package is more than what plaintiff would receive in redemption under Section 1.4. In particular, plaintiff has identified a number of issues with the Valuation Report, which calculates the value of CDL School to be in the range of $40 to $41 million.
First, it is unclear whether Corrada is "the certified public accountant . . . servicing the books of [CDL School]" (Shareholders' Agreement, § 1.4). In particular, plaintiff contends that Marcum LLP is the accounting firm referred to in Section 1.4 (see Michael Reply Aff., ¶ 11).
Second, the Valuation Report fails to disclose the methodology by which Corrada arrived at his $40 to $41 million valuation. According to the report, Corrada performed a "calculation engagement," which means that he and his client "agree[d] on the specific valuation approaches and valuation methods the [accountant] will use and the extent of valuation procedures the [accountant] will perform" (Valuation Report, p. 1). Corrada explains that "[a] calculation engagement does not include all of the procedures required in a valuation engagement," and "the results might have been different" had he undertaken a valuation engagement (id.).
Thus, while Corrada and CDL School's representative (presumably Albert) reached an agreement on the specific procedures to be used to determine the value of CDL School for purposes of the redemption, the Valuation Report does not describe the valuation procedures or approaches that were employed. In the Court's view, the absence of any description of the accountant's methodology in a client-driven "calculation engagement" is troubling where, as here, the client representative/majority owner has a strong pecuniary interest in the outcome of the valuation and allegedly has represented to the minority shareholder "on multiple occasions that [the accountant] will do anything [the majority owner] tells him to do" (Michael Reply Aff., ¶ 12; see Surgem, LLC v Achievmed, Inc., 2013 WL 5629149, *5, 2013 NJ Super Unpub LEXIS 2491, *15 [NJ Super Ct App Div, Oct. 16, 2013]).
Finally, there is nothing in the Valuation Report that quantifies the Sale Proceeds. Plaintiff claims to have been informed by Albert that the asset sale would generate about $80 million, whereas Albert now maintains that the value of the transaction will not exceed $50.5 million (see Michael Reply Aff., ¶ 17). The fair market value of plaintiff's shares will, of course, be heavily influenced by the amount of the Sale Proceeds.
For all of the foregoing reasons, defendants have failed to demonstrate that the availability of the Severance Package conclusively defeats plaintiff's claim of oppression under BCL § 1104-a (a) (1).
3. Availability of Buy-Out Under Shareholders' Agreement
Defendants further argue that the involuntary dissolution of CDL School would not be appropriate under BCL § 1104-a (b) (1) in any event. They base this argument on the availability of the forced buy-out remedy of Section 1.4 that allows plaintiff's shares to be redeemed for their "[f]air market value" pursuant to a valuation performed by the corporation's accountant (Shareholders' Agreement, § 1.4 [i]). According to defendants, any disagreement that plaintiff may now have with respect to the buy-out methodology prescribed in Section 1.4 is not a basis for disregarding his prior assent to the process.
Under BCL § 1104-a (b) (1), the denial of a petition for dissolution is appropriate if the minority shareholder "may obtain a fair return on his [or her] investment pursuant to the buy-out provisions of the shareholder[s'] agreement" (Matter of Harris [Daniels Agency], 118 AD2d 646, 647 [2d Dept 1986]; see also Matter of Pace Photographers [Rosen], 71 NY2d 737, 746 [1988]).
Initially, plaintiff suggests, without citation to authority, that the Shareholders' Agreement no longer is in effect. Plaintiff asserts that the Agreement "likely . . . terminated upon the sale to TransForce pursuant to its express terms, which provide for termination upon 'the Company's liquidation, dissolution or filing for bankruptcy'" (NYSCEF Doc No. 69, p. 9, quoting Shareholders' Agreement, § 3.1 [i]). Thus, "it is certainly plausible, if not certain, that the Shareholders' Agreement terminated upon the sale to TransForce" (id.).
The Court does not find this argument to be convincing. The assets of CDL School were sold to TransForce, but there was no merger, consolidation or transfer of the voting power or ownership of CDL School. Further, the Sale Proceeds were not distributed and remain as capital of the corporation. And while plaintiff makes much of the fact that CDL School and its shareholders contractually are prohibited from engaging in activities related to educating and training commercial drivers, the fact remains that CDL School was formed to engage in "any lawful act or activity for which corporations may be formed under the [BCL]" (Certificate of Incorporation). Thus, the controlling shareholders and directors of CDL School are free to pursue other and different business opportunities on behalf of the corporation using the Sale Proceeds, consistent with the authority provided by BCL § 402 (a) (2) and the Certificate of Incorporation, so long as they act in good faith and in accordance with the duties owed to the minority.
On these facts, and in the absence of any contractual definition of "liquidation," the Court concludes that plaintiff has failed to demonstrate that the asset sale to TransForce constituted a "liquidation" of CDL School that would terminate the Shareholders' Agreement. 
On the merits, the Court concludes that a forced redemption under Section 1.4 may constitute an adequate alternative to the involuntary dissolution of CDL School, but the present record fails to conclusively establish that application of Section 1.4 in the manner contemplated by defendants will accord plaintiff a fair return. Substantial questions remain as to who is to perform the valuation, the methodology by which the Valuation Report was prepared, the fair market value of plaintiff's shares,[FN2]
and the factual and financial information that Corrada relied upon in assigning CDL School a value of no more than $41 million (see Matter of Campbell v McCall's Bronxwood Funeral Home, Inc., 168 AD3d 451, 452 [1st Dept 2019]; DiPace v [*11]Figueroa, 223 AD2d 949, 951-952 [3d Dept 1996]).
B. Common-Law Dissolution (CDL School)
Defendants seek dismissal of the claim for common-law dissolution of CDL School, arguing that plaintiff has failed to state a viable cause of action.
New York has long recognized the common-law right of a minority shareholder to petition for dissolution "where the controlling shareholders engaged in certain egregious conduct, such as where the directors and majority shareholders have so palpably breached the fiduciary duty they owe to the minority shareholders" (Fedele v Seybert, 250 AD2d 519, 521 [1st Dept 1998] [internal quotation marks and citations omitted]). Thus, "the remedy of common-law dissolution is available only to minority shareholders who accuse the majority shareholders and/or the corporate officers or directors of looting the corporation and violating their fiduciary duty" (Matter of Sternberg [Osman], 181 AD2d 897, 897-898 [2d Dept 1992], appeal dismissed 80 NY2d 892 [1992]).
Here, plaintiff alleges that defendants breached their fiduciary duties by, among other things, threatening to tie up the Sale Proceeds in unrelated business ventures having nothing to do with the historic mission of CDL School, while according themselves financial benefits from the Sale Proceeds in the form of excessive bonuses and large personal loans. 
Assuming the truth of these allegations and giving plaintiff the benefit of all favorable inferences at this early stage of the litigation, the Complaint sufficiently alleges a cause of action for the common-law dissolution of CDL School.
C. Dissolution of CDL Research
Defendants argue that this Court lacks jurisdiction over plaintiff's fifth cause of action, which seeks the judicial dissolution of CDL Research pursuant to Fla. Stat. § 605.0702 and/or the common law.
CDL Research is "a Florida limited liability company [formed] pursuant to the provisions of the Florida Limited Liability Company Act" (Operating Agreement, p. 1). "A claim for dissolution of a foreign limited liability company is one over which the New York courts lack subject matter jurisdiction" (Matter of MHS Venture Mgt. Corp. v Utilisave LLC, 63 AD3d 840, 841 [2d Dept 2009] [citations omitted]). Thus, notwithstanding the efficiency and economy considerations cited by plaintiff, this Court's lack of subject matter jurisdiction is fatal to the claim for dissolution of CDL Research, as well as to plaintiff's request for an "ancillary accounting" (Rimawi v Atkins, 42 AD3d 799, 801 [3d Dept 2007]; see Matter of Raharney Capital, LLC v Capital Stack LLC, 138 AD3d 83, 87-88 [1st Dept 2016]). Accordingly, plaintiff's fifth and sixth causes of action must be dismissed.
D. Forum Selection Clause
Finally, defendants contend that plaintiff's remaining claims must be dismissed on the basis of the forum selection clauses included in the Corporations' shareholder/member agreements. In particular, Section 6.3 of CDL School's Shareholders' Agreement provides that the Agreement "shall be governed by, construed and enforced in accordance with the internal laws of the State of Florida, and venue for any dispute under the Agreement resulting in litigation shall be in Miami-Dade County, Florida." Section 15.11 of CDL Research's Operating Agreement similarly provides that "venue for the exclusive enforcement hereof shall be Miami-[*12]Dade County, Florida."
"A contractual forum selection clause is prima facie valid and enforceable unless it is shown by the challenging party to be unreasonable, unjust, in contravention of public policy, invalid due to fraud or overreaching, or it is shown that a trial in the selected forum would be so gravely difficult that the challenging party would, for all practical purposes, be deprived of its day in court" (Puleo v Shore View Ctr. for Rehabilitation & Health Care, 132 AD3d 651, 652 [2d Dept 2015] [internal quotation marks and citations omitted]; see CPLR 501; Tatko Stone Prods., Inc. v Davis-Giovinzazzo Constr. Co., Inc., 65 AD3d 778, 779 [3d Dept 2009]).
The causes of action seeking the dissolution of CDL School, an accounting of the corporation and interim relief under BCL articles 11 and 12 plainly arise under New York's statutory and common law, and this Court is the proper venue in which to seek such relief (see BCL §§ 102 [10]; 1112; Matter of Supplier Distrib. Concepts, Inc., 80 AD3d 869, 870 [3d Dept 2011]). In this regard, the Court observes that the Severance Package offer was not made pursuant to the Shareholders' Agreement, and defendants invoke the forced redemption provision of Section 1.4 as a defense to dissolution (see Phillips v Audio Active Ltd., 494 F3d 378, 391 [2d Cir 2007]; Production Resource Group, L.L.C. v Martin Professional, A/S, 907 F Supp 2d 401, 412-413 [SD NY 2012]). 
Likewise, plaintiff's derivative claims against defendants for breaches of fiduciary duty arise under the common law, not the terms of the Shareholders' Agreement or Operating Agreement. 
Nor have defendants established that plaintiff's request for a declaration of rights concerning his interest in the Corporations and the Sale Proceeds arises under the Shareholders' Agreement or Operating Agreement.[FN3]

Based on the foregoing, the branch of the motion seeking dismissal of the remaining claims as barred by the forum selection clause(s) is denied (see generally Schmelkin v Garfield, 85 AD3d 755, 755-756 [2d Dept 2011]).
INTERIM RELIEF
The remaining issue before the Court at this juncture is plaintiff's application for interim relief, which was made by OTSC dated March 7, 2019.[FN4]
Plaintiff seeks the appointment of a temporary receiver for CDL School and an injunction restraining defendants from, in essence, engaging in the types of oppressive conduct alleged in the Complaint. According to plaintiff, such relief is needed to protect CDL School's assets because "Albert and Andrea's self-dealing [*13]and otherwise oppressive actions and inactions have created a risk of present and future harm to the Corporation and Michael's interest in same" (NYSCEF Doc No. 21, p. 13).[FN5]

A. Legal Standard
"At any stage of an action or special proceeding under [BCL article 11], the court may, in its discretion, make all such orders as it may deem proper in connection with preserving the property and carrying on the business of the corporation, including the appointment and removal of a receiver under [BCL] article 12" (BCL § 1113). 
Under BCL article 12, a court may appoint a receiver in a proceeding for dissolution (see id., § 1202 [a] [1]), including a temporary receiver (see id., § 1203 [a]). A temporary receiver may be granted all of the powers and duties of a permanent receiver, or so much of them as the Court deems proper (see id. [b]; see also id., § 1206).
The Court may also, "in its discretion, grant an injunction, effective during the pendency of the . . . [dissolution] proceeding," to "[r]estrain[] the corporation and its directors and officers from transacting any unauthorized business and from exercising any corporate powers, except by permission of the court" (id., § 1115 [a] [1]).
B. Analysis
In considering plaintiff's application for interim relief, the Court begins by examining the extent to which such relief has been proven to be "necessary for the protection of the parties to the action and their interests" (Matter of Di Bona [General Rayfin Ltd.], 45 AD2d 696, 696 [1st Dept 1974]).
A considerable portion of plaintiff's allegations of oppression concerns the Severance Package. Plaintiff alleges that defendants have used their control over CDL School to force him to accept the Severance Package — a buy-out offer that allegedly constitutes "a steep reduction of [Michael's] rightful share of the Sale Proceeds" (Michael Reply Aff., ¶ 7). In particular, plaintiff cites defendants' alleged threats to tie up the bulk of the Sale Proceeds in unrelated real-estate investments while defendants grant themselves multi-million dollar loans and bonuses out of the remaining proceeds.
Even assuming the truth of plaintiff's allegations and that such conduct constitutes oppression under BCL § 1104-a, there no longer appears to be any significant likelihood that defendants intend to force a voluntary buy-out through oppressive means. Rather, by the end of February 2019, defendants had noticed their intention to pursue the forced redemption of plaintiff's shares pursuant to Section 1.4 at a special shareholders' meeting on March 11, 2019 (see NYSCEF Doc No. 10). The special meeting was stayed, however, by operation of the TRO included in the March 7, 2019 OTSC. Having concluded that Section 1.4 and the rest of the Shareholders' Agreement presently remains in force and effect (see supra), it no longer appears that interim relief is necessary to guard against the prospect of a coerced "voluntary" buy-out.
The second principal set of oppression allegations concerns defendants' efforts to pursue a [*14]forced redemption under Section 1.4 on the basis of the Valuation Report prepared by Corrada. In this regard, plaintiff argues, in essence, that defendants have manipulated the valuation process to produce an artificially low purchase price for plaintiff's shares. 
There plainly remains a substantial risk that defendants will move forward with the contemplated Section 1.4 redemption in the absence of interim relief. As stated above, a special shareholders' meeting to authorize the redemption would have been held on March 11, 2019 absent the intervention of this Court, and it appears that defendants would resume this process if the TRO were lifted. 
Moreover, defendants acknowledge their intention to use CDL School's long "history of strong credit, operational expertise, and commercial relationships . . . to move the [Corporations] in a different direction," including the possibility of investing the "capital gains from the sale into qualified opportunity zones" (Albert Aff., ¶ 39). Thus, there also remains the risk that the Sale Proceeds will irrevocably be committed to a new venture during the pendency of this lawsuit.
Finally, given the proof that defendants (but not plaintiff) received $8 million in loans from CDL School on highly favorable terms in February 2019 (see NYSCEF Doc Nos. 125-128), there is some basis for concern that, absent interim relief, defendants will deplete the Sale Proceeds by granting themselves additional loans and/or bonuses without according plaintiff equal treatment (see Matter of Kemp & Beatley [Gardstein], 64 NY2d at 69).
Based on the foregoing, the Court finds that plaintiff has sufficiently demonstrated the need for an injunction pursuant to BCL § 1115 (a) (1) to protect the Sale Proceeds held by CDL School until the merits of plaintiff's claim for dissolution can be adjudicated. However, plaintiff has not established the necessity of the appointment of a temporary receiver on the present record (see generally Matter of Di Bona [General Rayfin Ltd.], 45 AD2d at 696).
CONCLUSION
Accordingly,[FN6]
 it is 
ORDERED that the motions of defendants and the Corporations to dismiss the Complaint are granted to the extent of dismissing the fifth and sixth causes of action, and the motions are denied in all other respects; and it is further
ORDERED that counsel shall confer regarding the use of early mediation/ADR in this case, and shall report to the Court within two weeks from the date of this Decision & Order as to their clients' willingness to participate; and it is further
ORDERED that, unless the case is stayed by order of this Court during the pendency of mediation, defendants and the Corporations shall answer the Verified Complaint/Petition within thirty (30) days of service of this Decision & Order with notice of entry upon their counsel; and it is further
ORDERED that plaintiff shall have seven (7) days from service of defendants' answers in which to reply, and the matter shall be deemed renoticed for hearing upon the filing of plaintiff's reply (or the expiration of the time in which to do so); and it is further
ORDERED that, pending further order of Court, Albert V. Hanley III and Andrea K. Hanley are enjoined from: (i) making any threat or taking any action in violation of the [*15]Shareholders' Agreement and/or applicable statutory law; (ii) amending the Shareholders' Agreement; (iii) entering into any loans or encumbrances on behalf of CDL School; (iv) withdrawing, distributing or transferring any assets or property of CDL School, whether in the form of salaries, profit distributions, dividends, reimbursement of expenses or loans, except for expenses/payments made in the ordinary course of business; (v) redeeming, transferring or otherwise modifying the current ownership structure of CDL School; (vi) taking any action that impacts or dilutes plaintiff's interest in CDL School; (vii) using corporate funds to pay the counsel fees incurred by Albert V. Hanley III and/or Andrea K. Hanley in this action; (viii) conducting any special meeting of the shareholders of CDL School; and (ix) taking any action relative to CDL School outside the ordinary course of business, absent the prior approval of this Court.
This constitutes the Decision & Order of the Court, the original of which is being transmitted to the Albany County Clerk for electronic filing and entry. Upon such entry, plaintiff's counsel shall promptly serve notice of entry on all other parties (see Uniform Rules for Trial Cts [22 NYCRR] § 202.5-b [h] [1], [2]).
Dated: June 13, 2019
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1-21, 26, 31-51, 53-54, 61-69, 71-84, 125-128.
Footnotes

Footnote 1:As plaintiff correctly observes, the Severance Package is a voluntary buy-out offer, not a forced redemption under Section 1.4. Indeed, at the January 10, 2019 special shareholders' meeting, Albert stated as much: "[W]e are not doing a forced redemption here" (NYSCEF Doc No. 62 [meeting transcript], p. 50).

Footnote 2:The Valuation Report assigns a total value to CDL School, but not to plaintiff's 25% interest.

Footnote 3:While plaintiff's written submissions refer to his "interest" in the Sale Proceeds, it is hornbook law that "ownership of capital stock is by no means identical with or equivalent to ownership of corporate property" (Brock v Poor, 216 NY 387, 401 [1915]). Relatedly, "the mere fact that a closely held corporation may have substantial liquid assets which a shareholder wishes to reach is an insufficient basis for judicial dissolution" (Matter of Murphy [Gallagher Bros. Sand & Gravel Corp.], 120 AD2d 733, 735-736 [2d Dept 1986]).

Footnote 4:The OTSC also brought on plaintiff's causes of action for dissolution, but defendants moved to dismiss the Complaint in lieu of answering. Thus, the merits of the dissolution claims are not presently before the Court for disposition.

Footnote 5:The Court finds that interim relief is not warranted as to CDL Research in light of the dismissal of plaintiff's dissolution claim with respect to it. In particular, plaintiff has not demonstrated his entitlement to a preliminary injunction under CPLR article 63 on the basis of the claim for breach of fiduciary duty.

Footnote 6:The Court has considered the parties' remaining arguments and contentions, but finds them either unavailing and/or unnecessary to reach given the disposition ordered herein.